UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JENNIFER TROMBLEY,

                                    Plaintiff,

v.                                                              8:15-CV-00567
                                                                (TWD)
CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL
SECURITY,

                                    Defendant.
_____

APPEARANCES:                                        OF COUNSEL:

OFFICE OF MARK A. SCHNEIDER            MARK A. SCHNEIDER, ESQ.
Counsel for Plaintiff
57 Court Street
Plattsburgh, New York 12901

HON. RICHARD S. HARTUNIAN               ELIZABETH D. ROTHSTEIN, ESQ.
United States Attorney for the                 Special Assistant United States Attorney
Northern District of New York
Counsel for Defendant
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

OFFICE OF GENERAL COUNSEL            STEPHEN P. CONTE, ESQ.
Social Security Administration               Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**DECISION AND ORDER**</u>

        Plaintiff Jennifer Trombley brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a final decision of the Commissioner of Social Security ("Commissioner")

denying her Title II application for disability insurance benefits, Title XVI application for

supplemental security income ("SSI"), and application for child's insurance disability benefits.[1]

(Administrative Transcript ("T") at 14.[2])  This case has proceeded in accordance with General

Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of

Social Security benefits.  Both parties have filed briefs.  Oral argument was not heard.  Pursuant

to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States

Magistrate Judge.  (Dkt. No. 13. )  For the reasons discussed below, the Commissioner's decision

(Dkt. No. 9-2) is affirmed.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is twenty-seven years old, with a birth date of May 3, 1989.  (T. at 134.)

Plaintiff completed tenth grade in school and subsequently obtained a GED.  (T. at 34.)  She has

worked as a cashier and sales associate in retail, an overnight stock clerk in a retail lumber store,

and a hotel receptionist.  (T. at 171.)  Plaintiff initially alleged disability due to

depression/borderline personality, anxiety, post traumatic stress disorder ("PTSD"), dissociative

disorder, and social phobia.  (T. at 170.)

Plaintiff applied for disability insurance benefits and SSI on July 3, 2012.  (T. at 59-60.)

She applied for child's benefits on July 17, 2012.  (T. at 61.)  The date of alleged onset of

---

[1]  The Social Security Act provides disability insurance benefits for a disabled adult child
"on the earnings record of an insured person who is entitled to old-age or disability benefits" if
the claimant is "18 years old or older and ha[s] a disability that began before the [claimant]
became 22 years old . . . ."  20 C.F.R. § 404.350(a)(5) (2016).

[2]  The Administrative Transcript is found at Dkt. No. 9.  Citations to the Administrative
Transcript will be referenced as "T" and the page numbers as set forth therein will be used rather
than the numbers assigned by the CF/ECM docketing system.

disability in the applications was May 15, 2010.  (T. at 14, 134, 141.) The three applications were

initially denied on September 18, 2012.  (T. at 59-73.)  The explanation of determination on

Plaintiff's disability insurance benefits application stated that a determination had been made that

Plaintiff's condition was not disabling through March 31, 2012, when she was last insured for

disability benefits.  (T. at 74.)  Plaintiff's SSI application was denied based upon a determination

that her condition was not severe enough to keep her from working.  (T. at 72.)  Plaintiff's

application for child's insurance disability benefits was denied based upon a determination that

her condition was not disabling before age twenty-two.  (T. at 66.)

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (T. at 79-80.)

The hearing was held on November 13, 2013, before ALJ Arthur Patane.  (T. at 31-52.)  Plaintiff

was represented by counsel at the hearing.  (T. at 31.)  On February 21, 2014, the ALJ issued a

decision finding that Plaintiff had not been under a disability, as defined in the Social Security

Act, from May 15, 2010, through the date of the decision.  (T. at 24.)  The ALJ's decision

became the final decision of the Commissioner when the Appeals Council denied Plaintiff's

request for review on May 4, 2015.  (T. at 1-5.)  Plaintiff timely commenced this action on May

7, 2015.  (Dkt. No. 1.)

## II.     LEGAL STANDARDS

### A.     Applicable Law

To be considered disabled, a plaintiff seeking disability insurance or SSI benefits must

establish that she or he is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (2015).

In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.

*Id*., §§ 423(d)(2)(A),1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social

Security Administration ("SSA") promulgated regulations establishing a five-step sequential

evaluation process to determine disability.[3]  20 C.F.R. §§ 404.1520(a)(4) (2016), 416.920(a)(4).

Under that five-step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a "residual functional capacity"
> assessment, whether the claimant can perform any of his or her
> past relevant work despite the impairment; and (5) whether there
> are significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).  "If at any step a finding of disability or

non-disability can be made, the SSA will not review the claim further."  *Barnhart v. Thomas*, 540

U.S. 20, 24 (2003).

---

[3] In determining eligibility for disabled child's benefits, the term "disability" has
substantially the same definition as it does in traditional adult disability cases, and the five-step
sequential process is applicable.  *See Ahearn v. Astrue*, No. 1:08-cv-951 (GLS/VEB), 2010 WL
653712, at *3 (N.D.N.Y. Feb. 22, 2010).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). If the plaintiff-claimant meets his or her burden of proof, the burden shifts to the defendant-Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working. *Id.*

## B.     Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010); *see Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .'" *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered

throughout the administrative record.  *Featherly*, 793 F. Supp. 2d at 630 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citations omitted).  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).  If there is substantial evidence of record both for and against the Commissioner's decision, the court must uphold the decision absent legal error.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998).

## III.   THE ALJ'S DECISION

The ALJ found Plaintiff had not attained age twenty-two as of May 15, 2010, the alleged onset date.  (T. at 16.)   The ALJ also found Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  *Id.*   The ALJ determined Plaintiff had the following severe impairments: affective disorder, anxiety disorder, and personality disorder.  *Id*.  Plaintiff's back pain, recurrent wrist pain, migraines, and asthma were found to be non-severe physical impairments.  (T. at 16-17.)  The ALJ found that both before and after attaining the age of twenty-two, Plaintiff did not have an impairment, considered singly and in combination, that met or medically equaled the criteria of listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), and 12.08 (Personality Disorders) at 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (T. at 18-19.)

6

The ALJ determined that both before and after attaining age twenty-two, Plaintiff had the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can understand, remember, and execute simple, detailed, and complex instructions, though complex tasks under supervision; she can respond appropriately to regular workplace changes and stressors; she can interact with coworkers and supervisors without restriction; and she can have no more than superficial contact with the general public."  (T. at 20.)

IV.    THE PARTIES' CONTENTIONS

Plaintiff argues that the ALJ erred in: (1) giving too much weight to the consulting medical sources; (2) failing to find Plaintiff disabled under Listings 12.04 and 12.06;  (3) failing to find Plaintiff's migraine headaches, back pain, recurrent wrist pain, and asthma to be severe impairments; (4) finding in his RFC that Plaintiff could perform any work with her combination of mental illness, migraine headaches, back pain, and ganglion cyst; and (5) failing to credit Plaintiff's testimony regarding her limitations.  (Dkt. No. 15 at 2.[4])

The Commissioner contends that the determination that Plaintiff is not disabled within the Social Security Act is supported by substantial evidence and is based upon the application of correct legal standards.  (Dkt. No. 16 at 3.)

V.    DISCUSSION

A.    Severity Determination

Plaintiff's primary focus in her challenge to the ALJ's step-two severity findings is the

---

[4] Citations to the parties' Briefs (Dkt. Nos. 15 and 16) are to the page numbers assigned by the Court's CM/ECF system.

failure to find that her migraine headaches constitute a severe impairment. (Dkt. No. 15 at 29-30.) Plaintiff has also asserted, in conclusory fashion, that the ALJ "also erred in not considering her back pain, recurrent wrist pain, and asthma to be severe impairments." *Id*. at 30. Plaintiff's support for that assertion is the statement in her brief that "[t]hese impairments are all documented in the record and all add additional restrictions for her RFC." *Id.* The Court finds that the ALJ's non-severity determinations with respect to Plaintiff's migraines, back pain, recurrent wrist pain, and asthma are all supported by substantial evidence.

"Impairments" are "anatomical, physiological, or psychological abnormalities . . . demonstrable by medically acceptable clinical and laboratory techniques." 42 U.S.C. § 423(d)(3). "A severe impairment" is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" are defined as "the abilities and aptitudes to do most jobs."[5] *Id*. at 404.1521(a), 416.921(b). While the Second Circuit has held that the severity regulation is "valid only if applied to screen out *de minimis* claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), "the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012); *Prince v. Astrue*, 490 F. App'x 399, 400 (2d Cir. 2013) (a mere diagnosis, without evidence of severity of symptoms and functional limitations, does not mandate a finding

---

[5] Examples of basic work activities set forth in the regulations include such things as physical functions such as walking, standing, lifting and carrying; capacity for seeing, hearing, and speaking; understanding and carrying out simple instructions; use of judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

of disability); *Payne v. Astrue*, No. 11-cv-322 (RFT), 2013 WL 550677, at * 5 (N.D.N.Y. Feb. 12, 2013) ("The mere existence of a diagnosis, however, is insufficient to show that functional limitations are imposed as a result of the impairments.")

        1.    <u>Migraines</u>

In his severity assessment, the ALJ found that while Plaintiff had alleged persistent migraines, an MRI study done in April 2012 was within normal limits, there was no evidence in the record of observation under a neurologist, and Plaintiff was on record as stating that her migraines improved when she began using prescription glasses.[6]  (T. at 17-18, 360, 689.)

A September 2, 2012, SSA Report of Contact reports that Plaintiff had stated she had migraines almost every day and took Excedrin which helped to control them.  (T. at 205.) However, Plaintiff is also reported as saying that she was not receiving treatment for her migraines, except for a visit to the emergency room three weeks ago, and that she had never been an inpatient for migraines.  *Id*.  Plaintiff is reported as having stated that she "feels that migraines keep her from working when she has them."  *Id*.

Dr. David Welch conducted a physical examination of Plaintiff on September 12, 2012, for social security purposes.  (T. at 521-22.)  During the examination, Plaintiff reported having

---

[6] It is not at all clear that the ALJ correctly interpreted the Nurse's note from Plaintiff's October 9, 2012, appointment at Adirondack Medical Practice as Plaintiff having stated that her migraines had improved following her attainment of prescription glasses.  (T. at 689.)  The note actually reads "[p]atient feeling about the same compared to last visit she does not (sic) a decrease in migraine headaches since getting prescription glasses."  *Id*.  It appears just as likely, if not more so, that the word "have" was meant to follow the word "not" and was inadvertently omitted.  If the ALJ did misread the note, it would be harmless error in light of the substantial evidence supporting the non-severe determination.  *See, e.g., Barringer v. Comm'r Soc. Sec.*, 358 F. Supp. 2d 67, 82 n.26 (N.D.N.Y. 2005) (ALJ's incorrect rendition of facts in the record nothing more than harmless error where assessment supported by other substantial evidence).

intermittent migraines most of her life and having them two or more times a week at the time of her examination. (T. at 521.) Plaintiff was taking Excedrin for headaches at the time. *Id.*

Dr. Welch noted that Plaintiff's problems appeared to be primarily psychiatric and or psychosocial "but aggravated by the presence of recurrent migraine headaches most of which never appear to have been treated in a consistent fashion." (T. at 522.) Dr. Welch otherwise deferred to Plaintiff's psychiatry program for discussion of her psychiatric problems. *Id.* Dr. Welch's evaluation contained no assessment of functional limitations, if any, on Plaintiff's ability to do basic work activity as a result of her migraines. (T. at 521-522.)

Plaintiff's medical and mental health records contain limited information regarding her migraines, and as noted by Dr. Welch, the records show no clear and consistent pattern of treatment. *Id.* Plaintiff's Plattsburgh Pediatrics medical records note that Plaintiff was having migraines as of November 4, 2004. (T. at 587.) A June 9, 2006, note in Plaintiff's records with Plattsburgh Pediatrics noted that her headaches had greatly subsided, although she reported having had one the day before that subsided on its own. (T. at 580.) Although Plaintiff reported having had a migraine recently at a mental health therapy session on April 4, 2009, Plaintiff's mental health records seldom reference her migraines or list migraines on the Axis III diagnosis. (T. at 257.)

Plaintiff went to the emergency room at CVPH Medical Center complaining of a migraine headache at 11:42pm on June 20, 2012. (T. at 365-72.) She was diagnosed with a severe migraine, treated, and discharged at 1:26am on June 21, 2012. *Id.* Plaintiff's patient notes at Adirondack Medical Practice, beginning with her new patient examination on September 7, 2012, generally include headaches on the list of Plaintiff's medical problems but do not

address them in detail, note a current problem, or indicate any treatment. (T. at 685, 689, 694.) A Nurse's note dated April 9, 2013, however, did indicate that Plaintiff had reported an increase in migraines and was not finding Excedrin as effective. (T. at 699.) Plaintiff informed the nurse that she had taken Imitrex several years ago but it had made her nauseous. *Id*. Plaintiff was placed back on Imitrex on April 9, 2013. (T. at 701.)

Plaintiff testified at the hearing before the ALJ that she had been having migraines since she was a teenager, was getting them a couple of times a week or more, and was treated by her family doctor. (T. at 39.) According to Plaintiff since she began taking Imitrex, her migraines were not lasting more than four or five hours. (T. at 40.)

Although Plaintiff's medical records reference her having migraine headaches that started before the period during which she was gainfully employed and before she applied for disability insurance benefits and SSI, when Plaintiff applied for benefits, she did not include migraines among the causes. (T. at 170.) Moreover, at her hearing, Plaintiff blamed her inability to work on anxiety without implicating her migraines. (T. at 40.)

Based upon the spotty reference to Plaintiff's migraines and treatment for migraines in her medical and mental health records, despite her many years of having recurrent migraines; her normal MRI; Plaintiff's ability to work in retail, as a stock clerk, and as a hotel receptionist in spite of recurrent migraines; Plaintiff's claim that she left her last employment at Sam's Club because of increasing anxiety; and the absence of evidence in the record that Plaintiff's migraines affected her ability to do basic work, *i.e.*, a lack of medical evidence or other source opinions showing functional limitations on her ability to do basic work as a result of her migraines, the Court finds that there is substantial evidence in the record supporting the ALJ's determination

that Plaintiff's migraines constitute a non-severe impairment.

        2.    <u>Back Pain</u>

The ALJ acknowledged Plaintiff's claim of persistent back pain and resulting difficulty in maintaining a raised position with her arms in his decision. (T. at 17.) Based upon the record evidence, he nonetheless determined Plaintiff's back pain to be non-severe. (T. at 17.) The Court finds that the ALJ's determination is supported by substantial evidence in the record.

The ALJ noted that laboratory and diagnostic studies were inconsistent with the impairment or limitation claimed by Plaintiff. *Id*. The ALJ referenced a June 26, 2012, lumbosacral MRI study revealing vertebral bodies, disc space heights, bone marrow, and posterior elements all within normal limits. *Id*.; T. at 570-71. The ALJ pointed out that similar results were received in a June 2013 radiograph study. *Id*.; T. at 650. Based upon those studies, the ALJ found little support for Plaintiff's subjective complaints of radiating pain and numbness. *Id*.

The ALJ also noted that although Plaintiff complained of radiculopathy, there was no evidence of disc herniations, spinal stenosis, or paraspinal abnormalities. *Id*.; T. at 570. In addition, the ALJ explained that Plaintiff's musculoskeletal and neurological physical examinations were consistently within normal limits, with normal motor function, sensation, range of motion, and reflexes in all extremities; and that there was no evidence in the record of any gait abnormality or deficits in upper extremity ranges of motion or strength. *Id*.; T. at 339, 367-68, 378.

The ALJ found that Dr. Welch's exam, which revealed some mild tender point activity through the upper trapezius and posterior neck but no evidence of loss of motion in neck; normal

dorsal and lumbar spine; normal gait; good active and passive range of motion in all four extremities; and appropriate strength with no localizing weakness, was unsupportive of more than a minimal limitation in basic work. (T. at 17; Dkt. No. 16 at 20.)

        3.    <u>Recurrent Wrist Pain</u>

The ALJ determined that there was no evidence that a ganglion cyst on Plaintiff's right wrist caused more than minimal limitation in basic work activities and constituted a non-severe impairment. (T. at 17.) Plaintiff has claimed in conclusory fashion on this appeal that the ALJ should have found her recurrent wrist pain to constitute a severe impairment. (Dkt. No. 15 at 30.)

Plaintiff's medical records reveal that she was diagnosed with a ganglion cyst on her right wrist on October 28, 2003. (T. at 595.) The ALJ noted that the cyst had reportedly been drained several times. (T. at 17.) Plaintiff testified at her hearing that her ganglion cyst sometimes flared up and became swollen if she bent her wrist the wrong way so that she would have to wear a wrist brace and could not do crafts for a while. (T. at 47.) As noted by the ALJ, the report on a radiograph of Plaintiff's right wrist taken on January 20, 2012, revealed no significant abnormalities in the bones, joints, or soft tissue. (T. at 17, 361.) The ALJ concluded that the record was devoid of clinical support for any medically determinable impairment. (T. at 17, 102-03.)

The Court notes that although Plaintiff had the ganglion cyst during her employment in retail sales, stocking shelves, and as a hotel receptionist, there is no evidence in the record that it impacted on her ability to do her job. In addition, Plaintiff testified at her hearing that she spends a considerable amount of time knitting and crocheting, and at the time of her hearing, was

13

learning to embroider and cross-stitch.  (T. at 37.)

Based upon the foregoing, the Court finds that the ALJ's determination that Plaintiff's ganglion cyst and resulting intermittent wrist pain was a non-severe impairment is supported by substantial evidence.

4.    Asthma

The ALJ also found that Plaintiff's asthma was a non-severe impairment.  (T. at 18.)  As with her alleged back pain and wrist pain, Plaintiff has claimed in conclusory fashion that the ALJ erred in failing to find that her asthma constituted a severe impairment.  (Dkt. No. 15 at 30.)

Plaintiff's medical records reveal that she was treated in the emergency room at CVPH Medical Center for asthma attacks on January 2, 2010, and June 11, 2010, and was given Albuterol both times.  (T. at 406, 409.)   An SSA report of contact in the record reveals that when asked about her asthma on August 12, 2012, Plaintiff reported that her primary care provider treated her asthma, that she had not been seen in the emergency room or hospitalized for asthma, and that her asthma did not significantly impact her ability to function in a work environment. (T. at 205.)

The Court notes that Plaintiff had been diagnosed with and treated for asthma while she was still working and did not identify asthma as a disabling impairment or attribute her alleged inability to work in whole or in part to her asthma.  (T. at 40, 170, 205, 406.)  The Court further notes that there is no evidence in the record that would support a determination that Plaintiff's asthma had ever limited, or would, significantly limit, her ability to do basic work.  Therefore, the Court finds that the ALJ's determination that Plaintiff's asthma was a non-severe impairment is supported by substantial evidence.

14

## B.	Listing Determination

Plaintiff contends that the ALJ erred at step-three of his analysis by determining that Plaintiff's mental impairments did not meet Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders).  (Dkt. No. 15 at 25-27.)  To satisfy the requirements of Listing 12.04, a claimant must demonstrate continuous or intermittent symptoms listed in Section A *and* at least two of the following in Section B: marked restriction in activities of daily living; marked difficulties in social functioning; marked difficulties in maintaining concentration, persistence, and pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(A)-(B) (2013) ("App. 1").  Alternatively, a claimant must show a medically documented chronic affective disorder of at least two years' duration, with at least one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that resulted in such a marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living environment.  App. 1 at § 12.04(C).

To satisfy the requirements of Listing 12.06, a claimant must show specific symptoms listed in Section A of the Listing *and* at least two in Section B, which are the same as in Listing 12.04.  *Id.* at § 12.06 (A)-(B).  Alternatively, a claimant must show the specific symptoms listed in Section A *and* a complete inability to function independently outside the area of her home.  *Id*. at § 12.06(C).

For the reasons that follow, the Court finds that the ALJ's determination that Plaintiff did not meet Listings 12.04 or 12.06 is supported by substantial evidence.

15

1.      Paragraph B

In his analysis of whether Plaintiff's mental impairments, affective disorder and anxiety

disorder, considered singly and in combination, met or medically equaled Listings 12.04 and

12.06, the ALJ focused initially on the paragraph B criteria and concluded that the criteria were

not satisfied.  (T. at 18.)

Plaintiff's challenge to the ALJ's finding with regard to the Listings is largely conclusory.

Without citing evidence from the record, Plaintiff has asserted that "[a]ll of the treating sources

concluded that he (sic) was significantly limited in social functioning, had difficulty sustaining

focus, concentration, and ability to attend, had problems with his (sic) memory, had a low stress

tolerance, and was at risk of decompensation."  (Dkt. No. 15 at 29.)  Plaintiff has also asserted,

again without citing to record evidence, that "[t]he evidence conclusively shows that Ms.

Trombley has marked limitations in: activities of daily living; in maintaining social functioning;

deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks

in a timely manner (in work settings or elsewhere); and repeated episodes of deterioration or

decompensation in work or work-like settings which caused the individual to withdraw from that

situation or to experience exacerbation of signs and symptoms."  *Id.*

In support of her conclusory assertions as to her functional limitations, Plaintiff notes

that: (1) she has been treated for anxiety and depression since she was a child, and in March 2012

was given a GAF score of 40 and a diagnosis of dissociative identity disorder, social phobia,

cannabis dependence, and borderline personality by her treating psychiatrist, Dr. Schenkel;[7] (2)

    [7]  As noted by the Commissioner in her Brief, GAF is a rating of overall psychological
functioning on a scale of 0-100.  (Dkt. No. 16 at 10 n.4.)  A rating of 31 to 40 means some
impairment in reality testing or communication or major impairment in several areas such as

psychiatrist Dr. Kokernot incorporated Dr. Schenkel's assessments in his 2013 reports; and (3) in

a source statement given to the Clinton County Department of Social Services, Plaintiff's

counselor at Clinton County Mental Health ("CCMH"), Vicki Dauphinais, wrote that Plaintiff

could not perform competitive work.[8]  (T. at 29.)

The Court finds that the ALJ's paragraph B determination that Plaintiff had no marked

functional limitations is supported by substantial evidence.

a.      Activities of Daily Living

In determining that Plaintiff had a mild restriction in activities of daily living, the ALJ

noted Plaintiff's hearing testimony that she spends her days listening to music and working on

crafts.  (T. at 18.)  The ALJ also noted that Plaintiff had told consultative examiner (Brett

Hartman, Psy.D.) that she does her own cooking, cleaning, laundry, and money management;

gets along well with her parents; and attends counseling sessions.  (T. at 18, 502.)

The Court notes that the record also shows that at the time of the hearing in November

---

work or school, family relations, judgment, thinking, or mood.  41-50 signifies serious symptoms
or any serious impairment in social, occupational, or school functioning.  51-60 means moderate
symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

[8]  The records show that Dr. Schenkel gave a GAF score on Plaintiff on only one
occasion.  (T. at 463-65, 758-60.)  Although Dr. Kokernot initially made no change to Dr.
Schenkel's diagnosis of Plaintiff (T. at 757), shortly after Plaintiff was transferred to his care, he
began to list her diagnosis as PTSD and does not appear to have adopted Dr. Schenkel's GAF
score or to ever have assigned Plaintiff a GAF score.  (T. at 750-57.)  In her September 9, 2013,
medical source statement prepared for the New York State Office of Temporary and Disability
Assistance, in response to the question "[t]aking into consideration physical, mental and
addiction limitation(s), describe any working conditions, environments, or work activities which
are contraindicated," Ms. Dauphinais wrote "competitive work not indicated, but she is interested
in working (non-competitive)."  Ms. Dauphinais indicated that her statement was expected to last
"7-11 months to start."  (T. at 626.)

2013, Plaintiff, who had told Dr. Hartman in August 2012 that she had a goal of "becoming independent and having her own apartment," had been living in an apartment by herself for over six months. (T. at 35-36, 502.) In addition, Plaintiff's mental health records indicate that she was able to care appropriately for her grooming and hygiene. For example, in the Psychiatric Evaluation done by psychiatrist Dr. Schenkel on or about March 28, 2012, Plaintiff was found to be "appropriately groomed and dressed." (T. at 463.) Dr. Hartman described Plaintiff as "dressed in a casual and well groomed fashion" in his Psychiatric Evaluation of August 10, 2012. (T. at 501.)

The Court finds that the foregoing evidence well supports non-examining State agency consultant psychologist Dr. H. Ferrin's functional limitation assessment that Plaintiff had only a mild degree of limitation in activities of daily living, and the ALJ's finding to that effect. (T. at 547.) *See Barber v. Comm'r of Soc. Sec.*, No. 6:15-CV-0338 (GTS/WBC), 2016 WL 4411337, at * 7 (N.D.N.Y. July 22, 2016) ("It is well settled that an ALJ may rely on the medical opinions provided by State agency consultants and that those opinion[s] may constitute substantial evidence."); *Miller v. Colvin,* No. 15-CV-6249P, 2016 WL 4478690, at * 12 (W.D.N.Y. Aug. 26, 2016) ("the law refutes any suggestion that the opinions of non-examining physicians may never constitute substantial evidence to support an RFC determination"); *Baszto v. Astrue*, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010) ) ("[A]n ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.").

b.      Difficulties in Social Functioning

The ALJ found that Plaintiff has moderate difficulties in social functioning. (T. at 19.)

The ALJ acknowledged Plaintiff's claims of struggling in crowds and having difficulty establishing relationships. *Id.* He observed, however, that treatment notes regularly referenced either normal or only mildly impaired speech and language skills, and during Plaintiff's alleged period of disability, she participated in roller derby as a referee and teammate, suggesting she did not have marked limitations in social functioning. *Id.* The Court notes in addition that Plaintiff reported to Dr. Hartman that she got along well with her parents, although she avoided her siblings, and that she had a few friends, including one very close friend. (T. at 502.)

Without seeking the Court's permission or offering any reason for failure to incorporate it into the earlier proceedings in this matter, Plaintiff has submitted a September 14, 2015, letter to the Court from Danielle Baker ("Baker"), the 2013-2014 President of, and former skater with, the roller derby team with which Plaintiff was involved. (Dkt. No. 15 at 44-45.) Baker has identified herself as a physician assistant whose specialty is not mental health, but who has experience dealing with patients with depression and anxiety. *Id.* at 44. The letter contains the personal assessment of its author regarding Plaintiff's involvement with the roller derby team, as well as her belief that Plaintiff's experience with the team indicates that Plaintiff could not maintain a regular schedule; handle stress; or maintain attention, focus and concentration; and that she struggled in her interactions with others. *Id.*

Baker asserts that there are several misconceptions in the ALJ's decision regarding Plaintiff's involvement with the roller derby team. *Id.* The letter states that while Plaintiff enjoyed coming to practices and occasionally acting as referee, she was not a sufficiently competent skater to ever skate with the team. According to Baker, Plaintiff enjoyed coming to roller derby because she was a very shy, anxious, and isolated person who did not have other

19

social outlets. Because of that, according to Baker, team members went out of their way to be nice and supportive to her even though Plaintiff could be demanding and annoying, complained about her aches and pains, rubbed people the wrong way, and got upset at little things. *Id*. The letter states that Plaintiff did not attend all practices; missed several away games and refereed at most once a month (because there was generally only one game per month); had to stop refereeing in the middle of a game because of severe anxiety attacks on at least two occasions; and several times had to leave after-practice and games social gatherings because she was too uncomfortable being in a public place. *Id.*

Generally, "evidence not contained in the administrative record may not be considered [by a district court] when reviewing the findings of the Commissioner." *Collins v. Comm'r of Soc. Sec.*, 960 F. Supp. 2d 487, 500 (S.D.N.Y. 2013) (quoting *Brown v. Barnhart*, No. 02 Civ. 4523(SHS), 2003 WL 1888727, at 10 (S.D.N.Y. April 15, 2003) (citations omitted), *aff'd* 85 F. App'x 249 (2d Cir. 2004)). The reviewing court may, however, remand the claim to the Agency for consideration of evidence that is not contained in the administrative record "upon a showing that there is new evidence which is material and that there [was] good cause for the failure to incorporate such evidence" into the administrative record. 42 U.S.C. § 405(g) (sentence six); *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) (claimant must show good cause for failure to present evidence earlier) (citing *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1985)).

The Court finds that Plaintiff, who was represented by counsel in the administrative proceedings, has failed to satisfy the statutory requirement that she show good cause for failure to incorporate the letter or information contained in the letter into the prior proceedings. The Court further finds that even if Plaintiff had shown good cause for the delay in presenting the letter,

information in the letter is not material to the determination of whether Plaintiff meets Listings 12.04 or 12.06 or, as discussed below, the RFC.

To be material, the evidence must be relevant to the plaintiff's condition during the alleged period of disability and probative. *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004). While Baker's assessment relates to Plaintiff's condition during the period of disability, "the concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id*. The Court does not find that to be the case.

Although the Commissioner may use evidence from non-medical sources to show severity of impairments and how they affect a claimant's ability to work, *see* 20 C.F.R. § 404.1513(d), Baker is admittedly not a mental health specialist, and she did not have a professional relationship with Plaintiff. (T. at 44-45.) The Court concludes that what are essentially Baker's unsworn lay opinions with regard to Plaintiff's ability to maintain a regular schedule; handle stress; maintain attention, focus and concentration; and interact with others, based upon her involvement with Plaintiff in roller derby, would have been given little weight by the Commissioner had they been presented in the administrative proceedings. (T. at 45.)

The Baker letter confirms that Plaintiff did in fact participate in roller derby, albeit perhaps not at the same level as would be expected of someone without moderate difficulties in social functioning. (T. at 44-45.) The Court finds it unlikely, however, given the substantial evidence supporting the ALJ's determination, that Baker's personal observations regarding various aspects of Plaintiff's involvement with the roller derby team, including her enjoyment at coming to practices and occasionally refereeing games; limited skating ability; the warm

supporting nature of the team environment despite Plaintiff often being annoying and demanding

and "rub[bing] people the wrong way"; severe anxiety attacks on at least two occasions while

refereeing; and discomfort at social events with the team in public places, would have influenced

the Commissioner to decide Plaintiff's applications differently.  (T. at 44-45.)

Non-examining State agency consultant Dr. Ferrin concluded that Plaintiff had moderate

limitations in maintaining social functioning and concluded that Plaintiff's mental impairments

did not meet a listed impairment.  (T. at 537-49.)  The opinions of non-examining medical or

mental consultants can constitute substantial evidence under 20 C.F.R. § 404.1527.  *See Fessler*

*v. Astrue*, No. 09 Civ. 6905 (WHP)(JCF), 2011 WL 346553, at * 9 (S.D.N.Y. Jan. 10, 2011).

In addition, there is extensive evidence in the record indicating that Plaintiff participated

fairly extensively in roller derby.  Plaintiff received physical therapy in February 2012 for an

ankle sprain sustained while roller-skating for her roller derby team on December 23, 2011.  (T.

at 300.)  Plaintiff's physical therapy note from May 2, 2012, indicates that she was skating three

times a week even though it irritated her back and leg pain.  (T. at 297.)  On August 10, 2012,

Plaintiff told Dr. Hartman she helped with the local roller derby team.  (T. at 502.)  On March 13,

2013, Plaintiff reported to Dr. Kokernot that she continued to referee for roller derby two to three

times a week and was on skates when she refereed. (T. at 754.)  She also reported having a social

relationship with the other referees but not much with the players.  *Id*.  On July 3, 2013, Plaintiff

reported to Dr. Kokernot that while she had not skated for a couple of weeks because she had

fallen on her back, she planned on going to practice that evening and was scheduled to go on a

trip with the other referees that weekend.  (T. at 753.)  On September 4, 2013, Plaintiff reported

to Dr. Kokernot that she had been successful in getting to out of town roller derby meets.  (T. at

572.)  Plaintiff testified at her hearing that although she only refereed up to two games a month, she participated in roller derby on more less a weekly basis depending on her anxiety and depression, and that she did not socialize much with the other referees outside of roller derby. (T. at 38, 41.)

Based upon Plaintiff's self-reported good relationship with her parents, friendships, participation in roller derby, Dr. Ferrin's functional assessment, along with the absence of record evidence from Plaintiff's treating psychologists and therapist indicating marked limitations in social functioning, the Court finds that the record contains substantial evidence for the ALJ's determination that Plaintiff has moderate and not marked difficulties with social functioning.

c.      Difficulties in Maintaining Concentration, Persistence, and Pace

The ALJ found that Plaintiff has moderate difficulties in the area of maintaining concentration, persistence, and pace.  (T. at 19.)  The ALJ noted that Plaintiff enjoys watching television and working on crafts in her leisure, tasks that require sustained attention and concentration.  *Id.*; T. at 37.  The Court notes Plaintiff's testimony that she knits and crochets, and that she was also teaching herself to embroider and cross-stitch.  *Id.*  The ALJ acknowledged that sources had indicated some cognitive restrictions, particularly when considering subjective reports of difficulties with stress management.[9]  *Id.*  However, he determined that Plaintiff's participation in roller derby as a referee required attention, observation, and judgment while interacting with others and under outside scrutiny.  *Id.*

---

[9]  Dr. Hartman opined that Plaintiff had "moderate to marked difficulty dealing appropriately with the normal stressors of life."  (T. at 502.)  Dr. Hartman found Plaintiff's memory skills only mildly impaired, and her intellectual functioning to be somewhat below average.  *Id.*

In addition, the Court notes that Dr. Hartman found that Plaintiff had only mild difficulty in maintaining attention. (T. at 502.) The Court finds that the foregoing provides substantial evidence that supports Dr. Ferrin's assessment of Plaintiff as having moderate functional limitations in the area (T. at 547), as well as the ALJ's determination to that effect.

### d.     Episodes of Decompensation

The record reveals that Plaintiff suffered only one episode of decompensation. The episode occurred on July 29, 2012. (*See* T. at 469-94.)

### 2.     Paragraph C

The Court finds, based upon the record evidence referenced throughout this Decision, that the ALJ correctly concluded that none of the Paragraph C criteria under either 12.04 or 12.06 was satisfied in that there is no evidence in Plaintiff's medical records suggesting that her impairments resulted in a complete inability to function outside of her home; caused repeated episodes of decompensation; caused her to be unable to function outside of a highly supportive living arrangement; or resulted in such a marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause decompensation. (T. at 19.)

### C.     RFC Determination

A claimant's RFC is the most she or he can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. "A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work

24

schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quotations omitted)).

It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion. 20 C.F.R. §§ 404.1546(c), 416.946(c). In determining RFC, "the ALJ must consider objective medical facts, diagnoses and medical opinions, based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations." *Aiello v. Comm'r Soc. Serv.*, No. 5:06-CV01021 (DNH), 2009 WL 87581, at * 3 (N.D.N.Y. Jan. 9, 2009) (citing 20 C.F.R. § 404.1545). The ALJ must consider all of plaintiff's medically determinable impairments of which he is aware and the limiting effects of all impairments, even those not deemed severe, in determining RFC. 20 C.F.R. §§ 404.1545(a), 416.945(a). Age, education, past work experience, and transferability of skills are vocational factors to be considered. *Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999).

Physical abilities are determined by evaluation of exertional and nonexertional limitations. Exertional limitations include the claimant's ability to walk, stand, lift, carry, push, pull, reach, and handle. 20 C.F.R. §§ 404.1545(b), 416.945(b). Nonexertional limitations include mental impairments and difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. *Id.* A limited ability to carry out certain mental activities, "such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work." *Id*. at § 404.1545(d), 416.945(c).

The ALJ "is not required to accept the claimant's subjective complaints without question;

he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). Once the ALJ has resolved a claimant's complaints of pain, he can then evaluate exertional and non-exertional limitations. *Lewis v. Apfel*, 62 F. Supp. 2d 648, 658 (N.D.N.Y. 1999).

### D. Analysis of the ALJ's RFC Determination

As noted above, the ALJ found that Plaintiff had the RFC to "perform a full range of work at all exertional levels but with the following non-exertional limitations: she can understand, remember, and execute simple, detailed, and complex instructions, though complex tasks under supervision; she can respond appropriately to regular workplace changes and stressors; she can interact with coworkers and supervisors without restriction; and she can have no more than superficial contact with the general public." (T. at 20.)

Plaintiff argues that the ALJ erred in determining her RFC by: (1) giving too much weight to consultative examining psychologist Dr. Hartman and non-examining State agency consultant Dr. Ferrin (Dkt. No. 15 at 19-27); (2) failing to find that Plaintiff did not have the RFC to perform any work because of her combination of mental illness, migraine headaches, pain, and ganglion cyst, *id*. at 31-36; and (3) failing to credit Plaintiff's testimony regarding her limitations, *id*. at 36-41. For reasons explained below, the Court disagrees.

### 1. Claim that the ALJ Gave to Much Weight to the Consulting Medical Sources

Plaintiff had the burden of demonstrating her functional limitations. *See* 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(H)(i) ("[a]n individual shall not be considered to be under a disability unless [s]he furnishes such medical and other evidence of the existence thereof as the

Commissioner of Social Security may require."); 20 C.F.R. §§ 404.1512(c), 416.912(c) ("you must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say you are disabled. You must provide evidence, without redaction, showing how your impairment(s) affects your functioning during the time you say you are disabled . . . ."); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity."). "A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits." *Eusepi v. Colvin*, 595 F. App'x 7, 8 (2d Cir. 2014).

Under the "treating physician's rule," the ALJ must give controlling weight to a treating physician's opinion when that position is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(d)(2); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

Plaintiff has argued that the ALJ violated the treating physician's rule by failing to give controlling weight to the opinions of Plaintiff's treating psychiatrists and therapist and giving more weight to the opinion of non-examining consultant Dr. Ferrin. (Dkt. No. 15 at 26.) Plaintiff also asserts that the ALJ failed to consider the factors set forth in 20 C.F.R. § 404.1527(d)(2)(I) in determining the amount of weight to assign to the opinion of Plaintiff's treating psychiatrists.[10]

---

[10] The factors set forth in 20 C.F.R. §§ 404.1527(d), 416.927(d) are "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether

However, as noted by the Commissioner on this appeal, Plaintiff has failed to point to any opinion of functional limitations from her treating psychiatrists Dr. Schenkel and Dr. Kokernot to which controlling weight should be given.  (Dkt. No. 16 at 8.)  The only opinion evidence cited by Plaintiff was from her non-physician therapist, Ms. Dauphinais, and involved Plaintiff's ability to work.  *Id*. at 25.  In a September 19, 2013, report, Ms. Dauphinais opined in conclusory fashion in response to a question on limitations of work activities that "competitive work not indicated, but she is interested in working (non-competitive)." (T. at 625-26.)  Ms. Dauphinais does not fall within the treating physician's rule, and although the opinions of "other sources" should be given "some consideration," the ALJ is not required to give them controlling weight. *See Kohler v. Astrue*, 546 F.3d 268-69 (2d Cir. 2008).  Moreover, the question of whether or not a claimant can work is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d).

In the absence of opinion evidence on her functional limitations from her treating psychiatrists, Plaintiff has relied upon her psychiatrists' and  Ms. Dauphinais' treatment notes in support of her challenge to the ALJ's assignment of weight in the RFC.  Plaintiff relies heavily on Dr. Schenkel's diagnosis of PTSD, dissociative identity disorder, social phobia, cannabis dependence, and borderline personality, along with a single GAF score of 40 given by Dr. Schenkel on his initial evaluation of Plaintiff on March 28, 2012.  (Dkt. No.  15 at 24-27.)

It is well established that a mere diagnosis, without evidence of severity of symptoms and functional limitations, does not mandate a finding of disability.  *See Prince,* 514 F. App'x at 20; *Payne*, 2013 WL 550677, at * 5 ("The mere existence of a diagnosis, however, is insufficient to show that functional limitations are imposed as a result of the impairments.").

---

the physician is a specialist."  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).

Furthermore, a GAF score is only a snapshot of estimated functioning at the time the score is assessed. *See Schneider v. Colvin*, No. 13-cv-0790 (MPS), 2014 WL 4269083, at * 4 (D. Conn. Aug. 29, 2014) ("a GAF score is merely a 'snapshot opinion of one or more doctors as to an individual's level of social, psychological and occupational function at a specific point in time.'") (citation omitted); *Rock v. Colvin*, 628 F. App'x 1, 4 n.3 (2d Cir. 2015) ("Because the GAF score was properly discounted, we need not consider whether a GAF generally provides a reliable basis for disability determinations   a proposition questioned by several courts, both before and after the removal of the GAF metric from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders.") (collecting cases); *Mainella v. Colvin*, No. 13-CV-2453 -JG, 2014 WL 183957, at * 5 (E.D.N.Y. Jan. 14, 2014) ("The Social Security Administration issued a bulletin dated July 31, 2013, limiting use of GAF scores.  At a basic level, the Administration noted that the problem with using the GAF to evaluate disability is that there is no way to standardize measurements and evaluation. . . . There are other problems: the GAF score is not designed to predict outcomes, and the scores are so general that they are not useful without additional supporting description and detail.  . . . Generally, the guidance instructs ALJ's to treat GAF scores as opinion evidence; the details of the clinician's description, rather than a numerical range, should be used.") (internal citation and punctuation omitted)).  The Court notes that the ALJ did consider a GAF score of 55 assessed by providers at CVPH Medical Center on July 30, 2013, and found it to be consistent with those in Plaintiff's treatment notes and generally inconsistent with "markedly restrictive mental health symptoms and limitations."[11]

---

[11]  Plaintiff was assessed a GAF score of 55 on July 30, 2012, at CVPH Medical Center after having been brought there the previous night following a suspected suicide attempt.  (T. at 469, 493.)  Ms. Dauphinais assessed Plaintiff a GAF score of 56 on October 10, 2013.  (T. at

(T. at 21.)

The ALJ did consider Plaintiff's diagnosis as well as her treatment records in determining her RFC. (T. at 20-22.) In doing so, he noted and found significant that although Plaintiff had an established treatment history for bipolar disorder, generalized anxiety disorder, PTSD, and dissociative identity disorder that pre-dated her May 15, 2010, onset of disability, her records showed a gap in mental health treatment from July 2009 to 2012. (T. at 20-21, 24.)

The ALJ considered Plaintiff's mental health treatment records after she had re-established treatment at Clinton County Mental Health and noted that at her initial evaluation by Dr. Schenkel on March 28, 2012, where she complained of symptoms of PTSD, depression, anxiety, dissociation, and difficultly sleeping, Plaintiff was found to be alert, cooperative, and coherent; her grooming and appearance appropriate and healthy; speech at a normal rate with no evidence of delusion, psychotic signs, or cognitive deficits. (T. at 462-63.) Dr. Schenkel noted that while Plaintiff initially appeared depressed, it looked more like fatigue as the evaluation continued. (T. at 463.) Over the next several months, Plaintiff was started on a range of medications, including Buspirone, Clonidine, Keppra, Paxil, and Wellbutrin with some reported improvements. (T. 21, 464-65, 731-32, 747, 758-60.)

The Court also notes that on January 15, 2013, Plaintiff told Dr. Kokernot, to whom she had been transferred, that Dr. Schenkel was helping her with problems of dissociation, anxiety, and difficulty motivating herself, and she thought that the medications had been somewhat helpful. (T. at 756.) Plaintiff reported that there were days when she had a lot of trouble getting herself to do anything out of the house, but that she got herself out of the house a couple of times

_____

723.)

30

a week to go to roller derby and most of the time felt better for doing it.  *Id.*  One of her main complaints was difficulty sleeping.  *Id.*  Dr. Kokernot noted that he found Plaintiff's hygiene to be good; she was polite and cooperative; her mood was dysthymic and affect congruent; her thought processes flowed logically; and she was having problems with dissociation and had not yet seen an improvement in that since stopping the marijuana.  (T. at 757.)   While Plaintiff has asserted that Dr. Kokernot continued with the same assessment as Dr. Schenkel and incorporated Dr. Schenkel's assessments in his 2013 reports, Dr. Kokernot's subsequent treatment notes set forth a diagnosis of PTSD, and they contain no reference to a GAF score.  (T. at 752-54, 756, 758-60.)

On March 20, 2013, Dr. Kokernot reported that Plaintiff's thought processes flowed logically, and her thought content seemed to be feeling more empowered, especially with her referee activities.  (T. at 754.)  Plaintiff was found to be tearful and depressed by Dr. Kokernot on July 7, 2013, after she had stopped taking all of her medications.  (T. at 753.)  Dr. Kokernot recommended that she go back on Nefazodone, and on September 4, 2013, Plaintiff reported to Dr. Kokernot that she was satisfied with the medication but had trouble remembering to take it. (T. at 752.)  At that appointment, Dr. Kokernot found Plaintiff's grooming to be fair, motor activity normal, thought stream logical, thought content self-critical, oriented times 3, intelligence average, concentration good, memory okay, insight and judgment good, and interview behavior pleasant and cooperative.  *Id.*

The ALJ also relied upon the psychiatric evaluation of consultative psychologist Dr. Hartman, who opined that Plaintiff could follow, understand, and perform simple tasks; had mild difficulty maintaining attention, learning new tasks, performing complex tasks independently,

and making appropriate decisions; moderate difficulty maintaining a regular schedule and relating adequately with others; and had moderate to marked difficulty dealing with the normal stressors of life. (T. at 22, 502.) The ALJ found that overall, Dr. Hartman's assessment was consistent with Plaintiff's attention, concentration, behavior, and socials skills. (T. at 22.)

However, the ALJ found that Dr. Hartman's assessments of moderate to marked difficulties with stressors, moderate difficulty with maintaining a schedule, and mild difficulty with attention and concentration and complex tasks, appeared to "overestimate limitations." *Id*. The ALJ determined that those assessments appeared to be heavily based on Plaintiff's subjective reports during the examination, which differed from reports elsewhere. *Id*. Specifically, the ALJ noted in regard to social functioning, that Dr. Hartman recorded that Plaintiff appeared to have a chip on her shoulder rather than appearing anxious and depressed in the social setting. *Id*. According to the ALJ, while Plaintiff had told Dr. Hartman that her medications were not helpful, that was inconsistent with her treatment notes. *Id*.

The ALJ considered that Dr. Hartman's evaluation had shown that Plaintiff had proper grooming, normal motor behavior, fluent but monotonous speech and mildly impaired attention, concentration, and memory. *Id*. The ALJ noted that Plaintiff had reported that she did her own cooking, cleaning, laundry, and money management, got along with her parents, and regularly attended her counseling sessions. *Id*. The ALJ summarized that he had "afforded great weight to Dr. Hartman's assessment regarding attention, learning new tasks, relating adequately to others, performing complex tasks, and performing simple tasks . . . and little weight to his assessment of difficulties dealing appropriately with stress and maintaining a regular schedule." *Id*.

The ALJ also afforded great weight to non-examining consultative State agency

psychologist Dr. Ferrin's opinion that Plaintiff could understand and remember instructions, sustain attention and concentration, and maintain appropriate relations with others. (T. at 22; 553-54.) The ALJ found that Dr. Hartman's and Dr. Ferrin's opinions were supported by Plaintiff's hearing testimony that she spent her days listening to music, working on crafts, and watching television or movies, all of which required the ability to maintain concentration; and her activities with the roller derby team. (T. at 22, 23.) *See Baszto*, 700 F. Supp. 2d at 249 (an ALJ may rely on the medical opinions of both examining and non-examining consultants).

The ALJ summarized the rationale for Plaintiff's RFC in the following manner:

> Based upon the assessments of Dr. Hartman and Dr. Ferrin, the claimant's poor treatment history with "moderate" symptoms and limitations, the claimant's consistently normal mood, affect, speech, and cognition in medical notes, and claimant's own reports of activities of daily living, I find that she can understand, remember, and execute simple, detailed, and complex instructions, though complex tasks under supervision; she can respond appropriately to regular workplace changes and stressors; she can interact with coworkers and supervisors without restriction; and she can have no more than superficial contact with the general public. The latter restriction is based on my consideration of the claimant's allegations of difficulties with crowds and strangers, though I note that her testimony of difficulty interacting with people in general is inconsistent with her mental status evaluations, normal behavior in medical exams, and participation in roller derby refereeing. As such, I have not found limitations concerning coworkers or supervisors.

(T. at 23.)

In light of the foregoing, the Court finds that, contrary to Plaintiff's argument, the ALJ did not give too much weight to the opinions of Dr. Hartman and Dr. Ferrin on Plaintiff's functional limitations or fail to apply the treating physician's rule. As Plaintiff appears to have impliedly conceded in her Brief, there are no medical source statements in the record setting forth

Plaintiff's treating psychiatrists' opinions on her functional limitations, and the ALJ did consider Plaintiff's treatment notes in determining the RFC. (Dkt. No. 15 at 24; T. at 21.)

2.    Claim that the ALJ Erred in the RFC Because the Combination of Plaintiff's Mental Illness and Physical Impairments Prevented her From Doing Any Work

In Point IV of her Brief, Plaintiff argues that the ALJ erred in failing to find that her mental illness alone, and her mental illness in combination with her non-severe physical impairments of migraines, back pain, asthma, and ganglion cyst, prevent her from doing any work. (Dkt. No. 15 at 31-37.) Again, the Court disagrees.

The Court finds that the evidence discussed above establishes that the ALJ's RFC finding with regard to Plaintiff's mental impairments is supported by substantial evidence, including her treatment notes, her own testimony regarding her crafting activities and refereeing roller derby, and the opinions of Dr. Hartman and Dr. Ferrin. Furthermore, there is substantial evidence in the record that Plaintiff's non-severe physical impairments, whether considered separately or together with Plaintiff's mental impairments, had no limiting effect on Plaintiff's RFC as determined by the ALJ.

Plaintiff claims that the ALJ erred in failing to consider Plaintiff's migraines, back pain, asthma, and ganglion cyst, found to be non-severe at step-two, in determining her RFC. (Dkt. No. 15 at 38.) "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, No. No. 5:07-CV-0803 (LEK/VEB), 2009 WL 1940539, at * (N.D.N.Y. July 6, 2009) (citing 20 C.F.R. § 404.1545(b-e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010); *see also Parker-Grose v. Astrue*, 462 F. App'x 16, 18

(2d Cir. 2012) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) (remand for ALJ's failure to consider mental impairment found to be non-severe at step-two in determining RFC).

Although the ALJ indicated that he had given careful consideration to the entire record in determining Plaintiff's RFC, he did not expressly address Plaintiff's non-severe impairments in his RFC analysis. (T. at 20-23.) While the ALJ may not have specifically mentioned non-severe impairments by name in his RFC analysis, the record as a whole shows that he did evaluate those impairments and their possible limiting effects and found those limitations to be non-existent or *de minimis*, thereby rendering any legal error on his part harmless. *See Sherman v. Comm'r of Soc.* Sec., No. 7:14-CV-0154 (DNH), 2015 WL 5838454, at * 5 (N.D.N.Y. Oct. 7, 2015); *Darwin v. Colvin*, No. 2:14-cv-0740 AC, 2015 WL 4078233, at * 6 (E.D. Cal. July 6, 2015) (harmless error exists when it is "clear from the record that an ALJ's error was inconsequential to the ultimate nondisability determination.") (citation and internal quotation marks omitted); *Reilly v. Comm'r of Soc. Sec.*, No. 1:13-CV-1096 (RHB), 2015 WL 1459509, at * 9 (W.D. Mich. March 30, 2015) ("no purpose would be served and no different outcome would result by remanding for the ALJ to revisit the RFC only to restate its analysis in step-two."); *Campbell v. Colvin*, No. 2:13CV431 (MSD), 2014 WL 3828220, at * 5 (E.D. Vir. Aug. 4, 2014) (failure by ALJ to discuss plaintiff's mental impairment was harmless error where the evidence did not support functional limitations due to the impairment).

The ALJ's step-two analysis and the record evidence discussed herein reveal the lack of medical evidence showing functional limitation with regard to all of the non-severe impairments and show that there is substantial evidence establishing that the non-severe impairments were inconsequential to the RFC determination in this case.

### E.     The ALJ's Credibility Determination

#### 1.     Credibility Assessments

"It is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dept. of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citation and internal punctuation omitted).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  20 C.F.R. §§ 404.1529, 416.929; *Genier,* 606 F.3d at 49; SSR 96-7p, 1996 WL 374186, at * 5 (SSA July 2, 1996).  The ALJ is required to consider all of the evidence of record in making his credibility assessment. *Genier*, 606 F.3d at 50; 20 C.F.R. § 416.929(a)(3).

First, the ALJ must consider "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms."  SSR 96-7p, 1996 WL 374186, at * 2.  This finding does not involve a determination as to the intensity, persistence, or functionally limiting effects of the claimant's pain or other symptoms.  *Id.*  If no impairment is found that could reasonably be expected to produce pain or other symptoms, the claimant's pain or limitations cannot be found to affect the claimant's ability to do basic work activities.  *Id*.  An individual's statements about her pain or other symptoms are not enough by themselves to establish the existence of a physical or mental impairment, or to establish that the individual is disabled.  *See Grewen v. Colvin*, No. 1:11-CV-829 (FJS), 2014 WL 1289575, at *4 (N.D.N.Y. Mar. 27, 2014) (while a "claimant's subjective complaints are an important part of the RFC calculus . . . subjective symptomatology by itself cannot be the basis for a finding of disability . . . [and] [a] claimant must present medical

evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptoms alleged."); *see also* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996).

Once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been established, the second step of the analysis is for the ALJ to "consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with other objective medical evidence and other evidence." *Genier*, 606 F.3d at 49 (quoting 20 C.F.R. § 404.1529(a)); *see also Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (finding that claimant's subjective complaints of pain were insufficient to establish disability because they were unsupported by objective medical evidence tending to support a conclusion that he has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms); *see also* SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of [an individual's statements is their] consistency, both internally and with other information in the case record."). This includes evaluation of the intensity, persistence, and limiting effects of the pain or other symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities. *Genier*, 606 F.3d at 49.

The ALJ must consider all evidence of record, including statements the claimant or others make about her impairments, her restrictions, daily activities, efforts to work, or any other relevant statements the claimant makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony during

administrative proceedings.  *Id.* (citation omitted).

A claimant's "symptoms can sometimes suggest a greater level of severity than can be shown by the objective medical evidence alone."  SSR 96-7p, 1996 WL 374186, at *3.  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors:  (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve pain or symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to pain symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(iii), 416.929(c)(3)(i)-(vii).

## 2.  ALJ's Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ erred in determining that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  (Dkt. No. 15 at 38-43; T. at 20.)  The Court disagrees, finding that the ALJ considered the relevant factors and provided specific reasons which were supported by the record in his credibility finding.

Plaintiff testified that she suffers from flashbacks and nightmares and does not sleep well; her anxiety and depression keep her from going out and doing things; and that her problems with dissociation cause her to lose large chunks of time, sometimes whole days.  (T. at 37.)  Plaintiff also testified that she was having migraines that lasted four or five hours twice a week, and that

she has trouble lifting things or holding her arms up because of back pain. (T. at 38-39.) According to Plaintiff, she had to leave her last employment at Sam's Club because she was having anxiety attacks all the time at work and could not perform her duties. (T. at 40.) Her anxiety is brought on by talking to new people and being around too many people; she gets anxious riding in cars with people she does not know well, and her mother has to take her shopping because she has full blown panic attacks in stores.[12] (T. at 40, 43, 49.)

In assessing Plaintiff's credibility, the ALJ considered Plaintiff's testimony that her medications were helpful. (T. at 21, 39-40, 750, 752-53, 756-58.) The ALJ also considered the medical evidence suggesting that Plaintiff was overstating her limitations. (T. at 21-22.) In addition, he considered Plaintiff's activities of daily life, which included knitting, crocheting, journaling and story writing, and helping her mother with her day care business. (T. at 19, 37, 462, 502, 750, 754, 756.) The ALJ noted that Plaintiff cared for her own personal needs and did her own cooking, cleaning, laundry, and money management; got along well with her parents; spent time with a close friend; and refereed roller derby. (T. at 18-19, 21-22, 38, 368, 462, 502, 752-54, 756-57.) In addition, in his step-two analysis discussed above, the ALJ considered the medical evidence that suggested Plaintiff was overstating the severity of her back pain and migraines in her testimony. (T. at 17-18.) The foregoing establishes that the ALJ did not err in his credibility assessment, and that his findings are supported by substantial evidence.

**WHEREFORE**, it is hereby

---

[12] The ALJ gave consideration to Plaintiff's testimony regarding her difficulties with crowds and strangers and with interacting with people by including in her RFC that she can have no more than superficial contact with the general public, even though he found her testimony to be inconsistent with her mental status evaluations, normal behavior in medical exams, and participation in roller derby. (T. at 23.)

**ORDERED** that the Commissioner's decision is affirmed and Defendant's motion for judgment on the pleadings is **GRANTED** and the complaint (Dkt. No. 1) is **DISMISSED**.

Dated: September 27, 2016
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge